### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

ALEXANDER V. BEARD,              )
                                      )
           Petitioner,        )
                                        )
     v.                             )
                                      )    Civil Case No.  24-cv-1291
                                      )
JOSHUA MCDANNALD, *Taylorville*    )
*Correctional Center Warden*,     )
                                      )
           Respondent.     )

### ORDER AND OPINION

Presently before the Court are Respondent's [17] Motion to Dismiss Petitioner Alexander V. Beard's ("Petitioner") [12] Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 as time barred. For reasons stated below, Respondent's [17] Motion to Dismiss is GRANTED.

## I.      BACKGROUND

### A.  State Court Proceedings:

Following a jury trial in December 2013, Petitioner was convicted of three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i)), and one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1)) in McLean County, Illinois ("trial court"). (D. 1, p. 1). The charges stemmed from allegations made by a minor under the age of 13, S.W., regarding four separate instances of abuse between April and July 2013.[1]

---

[1] The evidence against Petitioner is discussed at length by the state appellate court in Petitioner's direct appeal, *see People v. Beard*, 2016 IL App (4th) 140286-U (Feb. 26, 2016) (D. 17-1), and several postconviction appeals, *see People v. Beard*, 2020 IL App (4th) 180120-U (June 25, 2020) (D. 17-5), *People v. Beard*, No. 4-21-0058, IL App (4th) (July 21, 2022) (D. 17-8), *People v. Beard*, 2023 IL App (4th) 220331-U (Feb. 1, 2023) (D. 17-11). The evidence presented at trial will be discussed in detail below when addressing Petitioner's actual innocence gateway claim.

In January 2014, the trial court denied Petitioner's post-trial motion for judgment notwithstanding the verdict finding the State had proved its case beyond a reasonable doubt and that the jury's findings were not against the manifest weight of the evidence. Petitioner also sent a letter to the trial judge claiming ineffective assistance of counsel for failing to call certain witnesses and failing to impeach other witnesses with eligible prior offenses. The trial judge denied Petitioner's ineffective assistance of counsel claim and found that Petitioner was not entitled to the appointment of new counsel because his trial counsel made "sound tactical decisions." After denying Petitioner's post-trial motions, the trial court sentenced Petitioner to eighteen years' imprisonment; consisting of six years for each of the aggravated criminal sexual abuse charges, to run concurrently, and twelve years for predatory criminal sexual abuse charge to run consecutively.

1. *Direct Appeal:*

Petitioner appealed, arguing: (1) the evidence was insufficient to convict him because the victim child's testimony was "incredible;" (2) the trial court erred by admitting into evidence "unreliable hearsay statements" from the victim child; and (3) that the trial court erred by not appointing Petitioner new counsel upon considering his post-trial claim of ineffective assistance of counsel. *Beard*, 2016 IL App (4th) 140286-U at ¶3. The state appellate court affirmed the trial court's judgment on February 26, 2016. *See id.* The Illinois Supreme Court denied Petitioner's leave to appeal ("PLA"), *People v. Beard*, 60 N.E. 3d 875 (2016), and the United States Supreme denied Petitioner's petition for writ of certiorari on October 10, 2017, *Beard v. Illinois*, 583 U.S. 922 (2017).

2. *Postconviction Petition:*

On November 16, 2017, Petitioner filed a Petition for Postconviction Relief under the Illinois Postconviction Hearing Act, (725 ILCS 5/122-2.1), arguing that: (1) the trial court erred

2

by admitting hearsay statements of the child victim; and (2) his trial counsel rendered ineffective assistance of counsel by failing to call and impeach witnesses and investigate his alibi defense.[2] (D. 17-4). On February 6, 2018, the trial court summarily dismissed the postconviction petition at the first stage finding Petitioner's arguments were frivolous and barred by *res judicata. Id.*; *see also Beard*, 2020 IL App (4th) 180120-U at ¶ 2, (D. 17-5).

Petitioner appealed and was appointed counsel. In August 2019, his appellate counsel moved to withdraw, arguing that Petitioner's claims were "without arguable merit," and barred by *res judicata. Beard*, 2020 IL App (4th) 180120-U at ¶ 23, (D. 17-5). On June 25, 2020, The appellate court granted the motion to withdraw and affirmed the trial court's judgment. The state appellate court agreed that *res judicata* barred all but two of Petitioner's present claims because they were previously denied on direct appeal. *Id.* at ¶ 30. The appellate court was unpersuaded by Petitioner's argument that "fundamental fairness" required application of a relaxed standard to the arguments he raised in his postconviction petition to bar the application of *res judicata*. *Id.* at ¶ 32. Petitioner's remaining argument on appeal alleged that his counsel was ineffective for failing to call an unnamed Department of Child and Family Services ("DCFS") at trial. The appellate court determined that Petitioner forfeited this argument when he failed to raise it in his direct appeal, despite being able to do so. The Illinois Supreme Court denied Petitioner's subsequent PLA on November 18, 2020. *People v. Beard*, 159 N.E.3d 941 (2020), (D. 17-6).

    3.  *Motions for Leave to File Successive Postconviction Petitions:*

---

[2] A postconviction petition proceeds through three stages. The first stage is summary dismissal, in which the trial court will determine whether the allegations allege the gist of a constitutional infirmity. Otherwise, the trial court can summarily dismiss, and the petitioner can appeal the decision. The second stage is the motion to dismiss stage, in which the State can file a motion to dismiss because of a procedural defect or lack of substantial showing of a constitutional violation. The third stage is an evidentiary hearing. *See* 725 ILCS 5/122-1, *et. seq.*

While his petition for postconviction relief was still pending before the state appellate court, Petitioner filed a motion for leave to file a successive petition for postconviction relief with the trial court. (D. 17-7). On September 3, 2020, the trial court entered an order explaining that the only basis for granting leave to file a successive postconviction petition was upon a showing of: (1) cause and prejudice; or (2) actual innocence. *Id.* The trial court then explained in detail why Petitioner's motion for leave failed to meet this burden and denied his motion. *Id.* Petitioner appealed, and the state appellate court affirmed the trial court's judgment. *People v. Beard*, No. 4-21-0058, IL App (4th) (July 21, 2022), (D. 17-8), and the Illinois Supreme Court issued the mandate denying Petitioner's PLA on January 4, 2023. (D. 17-9).

In November 2021, while Petitioner's motion for leave to file a successive postconviction petition was still pending before the appellate court, Petitioner filed a second motion for leave to a successive postconviction petition with the trial court claiming actual innocence and newly discovered evidence in the form of affidavits. (*See* D. 17-10). The affidavits submitted were from Petitioner's father and his girlfriend's children, Dontae Harris and Damien Harris. *Beard*, 2023 IL App (4th) 220331-U at ¶ 45. In short, Dontae and Damien Harris' affidavits both "averred that S.W. was never alone in the house with [Petitioner], S.W. had a reputation for lying, and Dontae and Damien were prepared to give statements in court, but defense counsel never spoke to them about those statements." *Id.* Petitioner "argues that these affidavits are newly discovered evidence that 'unambiguously rebut S.W.'s claims of repeatedly being alone with [Petitioner] in [his girlfriend's] house' and thus call into dispute at least two of [Petitioner]'s convictions." *Id.* Petitioner father's affidavit implies that S.W.'s claim that Petitioner abused her in a ballpark dugout could not have occurred, because of an email from the park's director eight years later.

4

In February 2022, the trial court denied Petitioner's second motion for leave to file a successive postconviction petition, explaining its reasoning as follows:

> The Court finds that the affidavits and exhibits attached to Petitioner's Motion are not newly discovered. These witnesses were known to Petitioner prior to trial. In fact Petitioner even asserts [Dontea and Damion Harris] appeared in court after taking a day off school, ready to testify. Petitioner allegedly lived with these witnesses at the time the abuse and assaults allegedly occurred. Newly discovered evidence is where it was discovered after trial and where Petitioner could not have discovered it earlier through the exercise of due diligence.
>
> The Court finds the evidence is cumulative. These witnesses' testimony will be that Petitioner could not have committed the abuse/assault because they did not see him alone with the victim. This was Petitioner's defense at trial. He testified. These witnesses would simply add to what he has already stated.
>
> ***
>
> The affidavits which state that Petitioner and Victim were not alone does not place the trial evidence in a different light which undermines the Court's confidence in the judgment of guilt. The State's allegations allege that the acts took place between the 1st of April, 2013 through the 1st day of July, 2013. Petitioner even asserts that the Victim was around for a substantial period of time and was told to go home several times. Defendant even testified at trial about a trip to Circle K where he and the Victim were alone.*** "On cross examination, [Petitioner's girlfriend] said she warned Defendant about spending so much time with [Victim], telling him it was not a good idea." The affidavits further assert that the Victim was in a relationship with another person named Luke. Even if true, this does not undermine the Court's confidence in the judgment of guilt.

(D. 17-10, p. 3) (internal citations omitted).

Petitioner appealed arguing that the trial court erred because the "affidavits were material, non-cumulative, and place the trial evidence in a different light while undermining the confidence of the jury's verdicts." *Beard*, 2023 IL App (4th) 220331-U at ¶ 5. The state appellate court disagreed and affirmed the trial court's decision. *See id.* at ¶¶ 39–50.[3] Petitioner's PLA to the Illinois Supreme Court was denied on May 24, 2023, *see People v. Beard*, 214 N.E. 3d 125 (2023),

---

[3] The state appellate court's decision only addressed the affidavits from Dontea and Damien Harris but does not specifically address or otherwise acknowledge the affidavit from Petitioner's father, Alfred Beard. *Beard*, 2023 IL App (4th) 220331-U at ¶¶ 45-49.

and United State Supreme Court denied Petitioner's *pro se* petition for writ for certiorari on October 16, 2023. (D. 1, p. 5).

On July 18, 2023, Petitioner filed a third motion for leave to file a successive postconviction petition based on actual innocence and ineffective assistance of appellate counsel, which the trial court denied on September 20, 2024. (D. 7-13). Petitioner's appeal of that denial is still pending.

**B.   Federal Court Proceedings:**

On August 19, 2024, Petitioner filed a § 2254 petition with this Court, (D. 1), and an amended § 2254 petition on March 10, 2025, (D. 12, "Amended § 2254 Petition"). The Amended § 2254 Petition lists the following "constitutional claims:" (1) sufficiency of the evidence; (2) inadmissible hearsay; (3) ineffective assistance of counsel exhausted with the Illinois Supreme Court on October 10, 2017; (4) *Batson* violations; (5) ineffective assistance of appellate counsel on direct appeal; (6) prosecutorial misconduct; (7) *Brady* violation; (8) jury receiving the wrong number of charges to deliberate on; (9) double jeopardy; (10) gateway actual innocence; (11) ineffective assistance of counsel on actual innocence claim. (D. 12, pp. 18–19).

## II.    DISCUSSION

Respondent has now moved to dismissed Petitioner's Amended § 2254 Petition with prejudice as untimely. (D. 17). Respondent argues that Petitioner did not file his Petition within the statute of limitations under 28 U.S.C. § 2244(d) and has not presented a claim of actual innocence that would excuse his fail to timely file his claims. (*See* D. 17). Petitioner acknowledges that his Petition is untimely but makes two arguments for why this Court should consider his petition timely. (D. 21). Both are without merit for the reasons set forth below.

**A.   Timeliness of Petition:**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute of limitations in which state court prisoners may bring § 2254 petitions. 28 U.S.C. § 2244(d)(1). The statute of limitations period begins running from the latest of four potential moments:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* at § 2244(d)(1)(A)–(D).

The limitations period does not run, or is tolled, during the time in "which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" *Id.* at (d)(2). Limitations periods are typically calculated under § 2244(b)(1)(A), and nothing in Petitioner's petition(s) indicate otherwise. *See Mayle v. Felix*, 545 U.S. 644, 662 (2005) (recognizing that limitations period is "ordinarily" calculated under subsection (A)).

Section 2244(d)(1)(A) consists of two prongs – the "conclusion of direct review" and the "expiration of time for seeking such review." *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). The United States Supreme Court has explained that each prong "relates to a distinct category of petitioners" as follows:

> For petitioners who pursue direct review all the way to this Court, the judgment becomes final at the "conclusion of direct review"—when this Court affirms a conviction on the merits or denies a petition for certiorari. For all other petitioners, the judgment becomes final at the "expiration of the time for seeking such review"—when the time for pursuing direct review in this Court, or in state court, expires.

*Id*.

Here, Petitioner's state conviction became final on October 10, 2017, when the United States Supreme Court denied his petition for writ of certiorari. *Beard v. Illinois*, 583 U.S. 922 (Oct. 10, 2017). The limitations period then ran for thirty-seven days, until November 16, 2017, when it was tolled due to Petitioner filing his state postconviction petition. *See* 28 U.S.C. § 2244(d)(2). Those proceedings concluded when the Illinois Supreme Court denied his PLA on November 18, 2020. At that point, the limitations began running again with 328 days remaining. Thus, Petitioner had until October 14, 2021, to timely file his § 2254 petition. Under § 2244(d)(1), his Petition is now nearly three years too late.

Petitioner has also not established that the State created an impediment to him filing his Petition, *see* 28 U.S.C. § 2244(d)(1)(B), nor has he alleged a claim based on a newly recognized constitutional right, *see id.* at § 2244(d)(1)(C). Although Petitioner states in his Amended § 2254 Petition that he was forced to file his Petition beyond the one-year statute of limitations due to the "State's inordinate delay of 14 months of no activity," (D. 12, p. 13), this is not a State created impediment under § 2244(d)(1)(B). The alleged "State delay" refers to the time his third motion for leave to file a successive postconviction petition was pending before the trial court. However, this motion was filed nearly two years after the limits period had expired and is irrelevant. *See De Jesus v. Acevedo*, 567 F.3d 941, 943 (7th Cir. 2009) ("a state proceeding that does not begin until the federal year has expired is irrelevant… § 2244(d) is an independent federal rule; a state's latitude or lassitude with respect to time does not extend the AEDPA's limit."). Moreover, Petitioner's unsuccessful motions for leave to file successive postconviction were "not [] properly filed postconviction action[s]" that would toll the statute of limitations. *See Martinez v. Jones*, 556 F.3d 637, 639 (7th Cir. 2009) ("[C]larify[ing] that the period during which a request to file a

successive petition is pending in Illinois state court does not toll the statute of limitations on actions under § 2254 unless permission is granted."). Further, Petitioner's reliance on this Court's decision in *Jackson v. Lawrence*, 2020 WL 5550385 (C.D. Ill. Sept. 16, 2020),which addressed whether the exhaustion requirements should be excused due to *Jackson's* allegations of state delays during his *initial* postconviction proceedings is inconsequential to Petitioner's argument of state court delays related to his third motion for leave to file a successive postconviction petition. *See De Jesus*, 567 F.3d at 944; *see also Martinez*, 556 F.3d at 639.

Finally, Petitioner argues his petition is timely under § 2244(d)(1)(D), because he has presented new evidence in the form of affidavits which relate to his claim of actual innocence. However, because Petitioner has been aware of the factual predicate for these affidavits since the time of trial and thus do not qualify as "new" or entitle Petitioner to a new period of limitations under § 2244(d)(1)(D) is inapplicable. *See McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013) ("As a matter of law, new evidence supporting a claim actually made at or before trial cannot form the basis of a new period under § 2244(d)(1)(D).").

### B. Equitable Tolling:

A Court may still allow an otherwise untimely petition if it determines equitable tolling applies. Equitable tolling is only available if the petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649, 130 S. Ct. 2549, 2562 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807 (2005)). The burden is on the petitioner to demonstrate both elements. *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016) (citing *Williams v. Buss*, 538 F.3d 683, 685 (7th Cir. 2008)). If petitioner fails to meet their burden as to either element, the petitioner is not entitled to equitable tolling. *Menominee Indian Tribe of*

*Wisconsin v. United States*, 136 S. Ct. 750, 756 (2016). "Although not a chimera—something that exists only in the imagination, equitable tolling is an extraordinary remedy that is rarely granted." *Carpenter*, 840 F.3d at 870 (internal citations and quotation marks omitted).

Petitioner has failed to demonstrate extraordinary circumstances under the *Holland* test. Petitioner concedes that most of his claims are not timely but argues that extraordinary circumstances, i.e., COVID-19 and limited access to the law library for at least two years, prevented a timely filing. (D. 21 at pp. 7-8). Limited legal material access are common circumstances for incarcerated individuals, not "extraordinary." *See Tucker v. Kingston*, 538 F.3d 732, 735 (7th Cir. 2008) ("[A] a prisoner's limited access to the prison law library is not grounds for equitable tolling."); *Arrieta v. Battaglia*, 461 F.3d 861, 867 (7th Cir. 2006) ("Mistakes of law or ignorance of proper legal procedures are not extraordinary circumstances warranting invocation of the doctrine of equitable tolling."). Further, notwithstanding Petitioner's purported limited access to the law library, he was able to pursue postconviction remedies through the state court system, including during the pandemic. Specifically, Petitioner does not explain how, in the face of these allegedly extraordinary circumstances, he was able to repeatedly file motions for leave to file successive state postconviction petitions and subsequent appeals but was unable to timely file his federal petition.

Similarly, Petitioner having COVID-19 twice and the Pandemic, by itself, does not constitute *per se* grounds for equitable tolling. *See Katz v. U.S. Dep't of Labor*, 857 Fed.Appx. 859, 864 (7th Cir. 2021). Petitioner also does not expand on when he had Covid, only that one it resulted in having to go to the emergency room and another time needing to be in isolation for ten days. Petitioner also blames Covid for there being limited to no access to the law library for two years but does not state when this two-year period was. Without this information, the Court cannot

10

determine that these circumstances impacted Petitioner's ability to timely file. And again, Petitioner was able to file state court documents after Covid started and before the statute of limitations ran for him to file his federal petition. Accordingly, the Court does not find that exceptional circumstances exist here.

### C. Actual Innocence Exception to § 2244's Statute of Limitations:

The Supreme Court has held that actual innocence provides an equitable exception to AEDPA's statute of limitations. *See McQuiggin*, 133 S.Ct. at 1928 ("Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar…or…expiration of the statute of limitations."). These claims, however, are rare and a "petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo,* 513 U.S. 298, 329 (1995).

"To pass through the 'actual innocence' gateway to merits review of a time-barred § 2254 petition, a state prisoner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *Patterson v. Adkins*, 124 F.4th 1035, 1046 (7th Cir. 2025) (quoting *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup*, 513 U.S. at 327)). Gateway claims require "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). When applying this standard, courts consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Patterson*, 124 F.4th at 1046 (quoting *House*, 547 U.S. at 538). The court must then make "a probabilistic determination about what reasonable, properly

11

instructed jurors would do," *Schlup*, 513 U.S. at 329, and "assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. This standard is demanding and permits review only in the extraordinary case. *See id.*; *see also Schlup*, 513 U.S. at 327).

Accordingly, the Court will now review the State's case against Petitioner and Petitioner's new evidence of actual innocence.

*1. Charges against Petitioner:*

Petitioner was charged in October 2014 with four counts of aggravated criminal sexual abuse and one count of predatory criminal sexual assault. *Beard*, 2023 IL App (4th) 220331-U at ¶ 7. The charges alleged that ""on or about the *1st day of April 2013 through the 1st day of July 2013*," Petitioner, "being at least 17 years old, on four different occasions committed an act of sexual conduct with S.W., a minor under 13 years of age." *Id.* Prior to trial, the State dismissed one of the courts of criminal sexual abuse. *Id.*

*2. The Jury Trial:*

For a summary of the State's evidence against Petitioner at his trial, the Court turns to the Illinois Appellate Court's decisions in *Beard*, 2016 IL App (4th) 140286-U and *Beard*, 2023 IL App (4th) 220331-U, as these factual findings are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010)(applying the presumption of factual correctness from § 2254(e)(1) to federal actual innocence claims when the issue of actual innocence was adjudicated in state court).

Petitioner's jury trial commenced with the testimony of 11-year-old victim S.W. Petitioner lived with S.W.'s neighbor, Candace. The trial also included the testimony of Candace's son (Estaban), Petitioner's girlfriend (Amanda Harris), and Amanda's two children (Dontae and Damien Harris). *Beard*, 2023 IL App (4th) 220331-U. S.W. would often go over to Candace's

apartment to play with the boys. She testified that "there came a time 'when something happened…with [Petitioner] that made [her] uncomfortable," and proceeded to describe the following four instances of prior sexual abuse by the Petitioner:

> In the first instance, S.W. was in Esteban's room at Candace's apartment wrestling with Esteban and defendant. Esteban left the room to use the restroom. When he left, defendant lay on top of her and would not let her up. He rubbed his penis on her vagina. She clarified that they were both clothed at the time. When asked what it felt like when defendant was rubbing his penis on her, she stated, "Like it was poking me, and it hurt." She asked him to get off of her, but he stopped only when she pushed him off.

> The second incident also occurred at Candace's apartment while S.W. was there with Esteban, the other boys, and defendant. S.W. was "lining" defendant's hair with clippers in the upstairs bathroom. She then asked him to leave so she could use the bathroom. Defendant left but then reentered while she was on the toilet. He then pulled his pants down and "just started to wash his body up." S.W. asked defendant to leave, but he did not. He pulled her pants down and forced her to lie on the floor, rubbing his penis on the outside of her vagina. She asked defendant to get off of her, but he did not stop until she "kind of kicked him in his balls."

> Sometime after the first two incidents, S.W. and defendant were at a park playing basketball when defendant took S.W. to the softball field dugouts and "tried to make [her] touch on his penis." She told him she did not "think [she] should do that cause that's inappropriate for [her] to do that to a grown man." S.W. testified that she did not touch him. Instead, they went back to playing basketball.

> The final incident occurred when defendant took S.W. to get soda and snacks in his van and pulled behind a store. S.W. had asked defendant to take her to Circle K, a convenience store, and defendant agreed. Instead of driving S.W. to Circle K, defendant drove to Family Dollar and parked behind the store. Defendant touched her leg as S.W. sat in the front passenger seat but stopped when she asked him to. However, defendant then pulled his pants down, pulled her pants down, and rubbed his penis on her vagina outside of her underwear. He then pulled her underwear down and rubbed his penis on her vagina. She asked him to stop, but he did not stop until she pushed him away. He then drove her home.

*Id.* at ¶¶ 14–17. S.W. was able to provide a rough timeline of the events but could not recall the specific amount of time between each incident. *Id.* at ¶ 18.

S.W.'s older sister's boyfriend, Luke Peterson, also testified that S.W. had told him about Petitioner's inappropriate sexual behavior during a conversation they had on July 27, 2013. During

that conversation Peterson had raised concerns about Petitioner's relationship with S.W. and wanted to know if anything had happened between them. *Beard*, 2016 IL App 140286-U at ¶ 8. S.W. then told Peterson that Petitioner "put his hands down her pants and asked her to suck his penis." *Id.* Peterson then told his girlfriend, S.W.'s sister, N.S., which led N.S. to ask S.W. if Petitioner had touched her. N.S. testified that S.W. told her "he had put his hands down her pants on a couple different occasions and he had asked her to give him oral sex." *Id.* at ¶ 9. Over the next few days N.S. tried asking S.W. more questions, but S.W. did not want to talk about it. *Id.* N.S. told their mother about S.W.'s allegations, but when their mother asked S.W., she did not want to talk about it, so she called the police. *Id.* at ¶ 19.

Finally, Jacob Walters, a McLean County Children's Advocacy Center employee, who interviewed S.W. testified laying a foundation for his recorded interview with S.W., "in which S.W.'s description of the incidents largely comported with her trial testimony." *Beard*, 2023 IL App (4th) 220331-U at ¶ 20. The recorded interview was subsequently published to the jury. *Id.* at ¶ 20. S.W. interview statements, however, differed from her trial testimony in the following ways:

> (1) regarding the incident in Esteban's room, S.W. said during the interview that defendant stopped when Esteban returned to the room, but at trial she said he stopped when she pushed him off; (2) regarding the incident in the bathroom, S.W. said during the interview that defendant stopped when someone knocked on the door but at trial she said defendant stopped rubbing on her only after she "kind of kicked him in his balls"; (3) regarding the incident at the Family Dollar, S.W. did not mention defendant touching her vagina with his penis during the interview; and (4) regarding the incident at the park, S.W. provided less detail during the interview than she did during the trial.

*Id.*

After the State rested, Petitioner called Candace, S.W.'s neighbor and his roommate. Candace testified that her son (Esteban), Petitioner, Petitioner's girlfriend (Amanda Harris), and

Amamda's two sons (Dontae and Damien Harris) lived with her for approximately two months, from late February to mid-April 2013. During that time, S.W. came over to her apartment almost every day to play with the boys. Amanda Harris then testified, corroborating Candace's testimony that they lived with Candace from February 23, 2013, until April 18, 2013. She also testified that S.W.'s mother called her on May 23, 2013, "asking if she knew where [Petitioner] and S.W. were because she could not find S.W." and that she "later learned [Petitioner]…had taken S.W. to Circle K." *Id.* at ¶27. On cross examination, Amanda admitted that "she had warned [Petitioner] about spending so much time with S.W., telling him it was not a good idea." *Id.*

Petitioner then testified on his own behalf, which the Illinois Appellate Court, on direct review, summarized as follows:

> [Petitioner] testified that S.W. came to Candace's "all the time" after school. However, if no one else was home, he would tell her to come back later, when other kids were around. He said he did not recall being upstairs in Esteban's room with Esteban and S.W. He said he and S.W. "were never alone" in Esteban's room. [Petitioner] denied ever making sexual contact with S.W. He also said S.W. never lined his hair. He recalled Amanda's son trimming his hair once in the bathroom with S.W. present but, he said, he was never alone with S.W. in the bathroom. [Petitioner] admitted taking the children, including S.W., to O'Neil Park but, he said, he and S.W. were never alone near the softball diamonds or the dugouts. He said they "would always be playing basketball in the basketball area or the skate park."

> [Petitioner] recalled the time, after he had moved out of Candace's apartment, when he dropped off movies to S.W.'s mother. S .W. asked defendant to take her to Circle K. [Petitioner] told her to ask her mother. He said S.W. asked, her mother said it was okay, and she gave S.W. money. They drove in Harris's van to Circle K, not to Family Dollar. He said neither he nor S.W. got into the back of the van. They both went into Circle K. [Petitioner] did not buy anything but S.W. bought a drink and chips. [Petitioner] drove S.W. home. He said there was a fight at Circle K, which delayed their trip, but they were only gone 10 to 15 minutes.

> [Petitioner] said he never had inappropriate contact with S.W. and he had "no idea why she would even make any type of accusations." He said he treated her like a daughter. He said: "I believe she was coerced into it."

15

On cross-examination, [Petitioner] described an incident when S.W.'s mother called him because S.W. was missing. [Petitioner] said he found her at Miller Park with Peterson. He also said, when the police were searching for him to arrest him regarding S.W.'s allegations, they found him hiding in a back bedroom under some covers.

*Beard*, 2016 IL App 140286-U at ¶¶ 28–31.

The jury found defendant guilty of three counts of aggravated criminal sexual abuse and one count of predatory criminal sexual assault.

3. *Petitioner's New Evidence:*

Petitioner's new evidence is in the form of affidavits from his father (Alfred Beard) executed on November 6, 2021, his girlfriend (Amanda Harris) executed on March 16, 2017, and Amanda's sons (Dontae Harris and Damien Harris) both executed on August 10, 2021.[4] Beard's November 2021 affidavit states he only became aware of his son's conviction and that he had been accused of touching a minor at O'Neil Park "recently, [that] year." (D. 1-1, p. 12). Upon learning this undertook a "personal investigation" and contacted the Director of Bloomington Parks *via* email on August 26, 2021, who told him that the softball fields are locked unless there was a game, or the grass is being mowed. *Id.* pp. 12-13. Beard attached, at least part, of his email with the park director to his affidavit. *Id.* at p. 14.

Amanda Harris affidavit expanded on her trial testimony that she lived with Candace, Candace's boyfriend, Candace's two children, Petitioner, and her two sons from between late February through April 18, 2013. *Id.* at pp. 17-18. She further explained that the reason they had moved out was due, in part, to an ongoing DCFS investigation into Candace, in addition to an "open domestic case" against Petitioner. *Id.* at p. 17. As a result, they moved in with Amanda's

---

[4] The Court will not consider the portions of these affidavits which allege that Petitioner's trial attorney was ineffective. As discussed above, that claim was denied when presented on direct appeal at the state level and a timely § 2254 petition raising that claim was not filed with this Court.

mother on April 18, 2013. Amanda further attested that S.W. was never left alone with Petitioner in Candace's home and that her kids were always present when S.W. was there. *Id.* She also stated that Petitioner's defense attorney considered using Dontae and Damien as witnesses at trial, and that she even brought them to trial to testify, but ultimately Petitioner's attorney told her that their testimony was not needed. *Id.*

Similarly, the affidavits from Dontae and Damien Harris aver that S.W. was never alone with Petitioner in Candace's house. *See id.* at pp. 2, 8. They also attest that S.W. had a reputation for lying and that they were both prepared to testify at Petitioner's trial, but his attorney never spoke with them and did not call them as witnesses. *See id.* at pp. 2-10. Their affidavits also stated that S.W. often went with them, their mom, and Petitioner to O'Neil Park, and attested that if there were no games being played a lock would be on the fence so no one could get into the field or dugouts. *Id.* at p. 3. Dontae further implied that S.W. had a relationship with Luke Peterson because they left O'Neil Park and went to another park together on day in April 2013, and then a few weeks later Candace's then eight-year-old son told him he saw S.W. and Peterson kissing. *Id.* When Petitioner and his mom later questioned S.W. about kissing Peterson, Dontae states that she denied it because she was afraid that she would get in trouble. *Id.* at p. 4. Damien's affidavit also adds that, while they were staying with Candace, Candace told them that S.W. was not allowed in their house unless she was home. *Id.* at p. 8.

The Government argues that Petitioner's affidavits are unreliable because they are from bias sources with close personal relationships with Petitioner, that they consist of inadmissible hearsay, and are "rife with speculation beyond the affiant's knowledge." (D. 17, pp. 11-13). The Government also highlights that Beard, Dontae Harris, and Damien Harris did not execute their affidavits until the later part of 2021, nearly eight years after Petitioner's trial and that gap in time

is a "substantial delay that could affect [witnesses'] memories and/or credibility." *Id.* at p. 14

(citing *Blackman v. Williams*, 823 F.3d 1088, 1102 (7th Cir. 2016)). The Government also argues

that the new evidence presented by Petitioner does not compellingly prove his actual innocence

and that trial evidence overwhelmingly establishes his guilt.

### 4.  *Application of the Actual Innocence Exception to Petitioner's Case*

The gateway standard is not a freestanding innocence claim; but rather allows a habeas

petition to overcome procedural bars if "new reliable evidence" (exculpatory scientific evidence,

credible eyewitness accounts, critical physical evidence, etc.) makes it "more likely than not that

no reasonable juror would have found him guilty beyond a reasonable doubt. *See e.g.*, *House*, 547

U.S. 518. The Supreme Court in *House* provides a good example of how the actual innocence

gateway works. *See id.* House, who had been convicted of murder, brought a procedurally

defaulted habeas claim by presenting new DNA evidence showing the semen on the victim's

clothing came from the victim's husband, not him. *Id.* at 540. At trial, the prosecution had relied

on the semen to establish House's motive for murder – sexual assault. *Id.* at 540–41. House also

produced evidence that strongly undermined the prosecution's blood evidence and evidence that

implicated the husband. *Id.* at 547–48. This included two witnesses who heard the victim's

husband confess to the crime. *Id.* at 549–50. The Court noted these witnesses were reliable as they

were "both lifelong acquaintances of [victim's husband]," and there was no evidence showing they

"would have wanted either to frame him or help [House]." *Id.* at 551. The Court found that House's

combination of "new reliable evidence"  met the high burden for establish the actual innocence

gateway as it "called into question" the "central forensic proof" tying Petitioner to the crime, and

"put forth substantial evidence pointing to a different suspect." *Id.* at 554.

18

Here, Petitioner argues that the affidavits he presented taken together with the unreliability of S.W.'s testimony at trial, call into serious doubt whether any reasonable jury would have found him guilty. The Seventh Circuit has set forth the type of evidence that can serve "[t]o demonstrate innocence so convincingly that no reasonable jury could convict," as including "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). In *Hayes*, the petitioner was serving a life sentence for robbing numerous people and attempting to murder one. *Id.* at 937. In an attempt to prove actual innocence, he submitted sworn statements from six relatives "who would have testified that he had been home watching a basketball game when the crime was committed." *Id.* At trial, the state had presented six eyewitnesses who identified him as the perpetrator. *Id.* The Court held that this evidence as insufficient to open the "gateway" as "the likelihood that [the petitioner's] family was willing to commit perjury" was greater than the likelihood that the eyewitnesses at trial each independently misidentified petitioner. *Id.*

Here, all the affidavits submitted by Petitioner as "new evidence" are from people he has close or familial ties to (his father, girlfriend, and girlfriend's children). As a result, they lack the indicta of credibility that would make it reliable eyewitness testimony. *See House*, 547 U.S. at 552 (the Supreme Court found testimony from new witnesses who had "no evident motive to lie" more reliable); *see also Hayes*, 403 F.3d at 938 (describing reliable evidence for the purpose of the actual innocence exception as the testimony of "some non-relative"). While Petitioner's father is the only relative of Petitioner who submitted an affidavit,  his knowledge is based on the park director's response to his vague email regarding whether the soft ball field would have been being locked eight years prior on an unspecified date. This does not qualify as new eyewitness testimony.

19

Amanda Harris and her sons also had a close personal relationship with Petitioner, and their affidavits also contain numerous hearsay statements (*i.e.* Candace's eight-year-old son told them that S.W. and Petitioner were never alone in his room and that he saw S.W. was kissing Peterson at the park) and speculation ("S.W. often lied to her sister and mom about everything she was doing" and S.W. and Peterson were afraid Petitioner was going to tell S.W.'s mom they were together). (D. 1-1, pp. 4–8).

The affidavits also suffer from the additional reliability problem due to their timing. *See McQuggin*, 133 S.Ct. at 1935 (finding courts must consider "the timing of the submission and the likely credibility of [a petitioner's] affiants" in evaluating the reliability of evidence of actual innocence). Here, Alfred Beard's, Damien Harris', and Dontea Harris' affidavits were obtained over seven years after Petitioner was convicted, despite most, if not all, being available to testify at the time of trial. While it is unclear where Petitioner's father was during this time, his vague explanation that he only learned about his son's conviction in 2021 is, at best, improbable and does not warrant the conclusion that Petitioner did not have the ability to request his father testify at trial. Although Amanda Harris' affidavit was completed a few years earlier in 2017, she testified at trial and provides no explanation as to why these statements were not included in her testimony. As stated above, it appears this may be because some of the statements in her affidavit are inadmissible under the rules of evidence.

Finally, even if the statements contained in the affidavits were deemed admissible at trial, the evidence does not undermine key assumptions on which the jury relied. The jury was aware of the minor inconsistencies between S.W.'s interview statements and her trial testimony. Despite this, her statements were overall generally consistent, and she was able to testify about each incident without prompting or leading questions. The jury also took into consideration Petitioner's

testimony denying he ever had sexual contact with S.W. or that he was ever alone with S.W. in Candace's apartment, which the affidavits only reiterate. Further, despite the statements in the Harris' affidavits, the trial testimony makes clear that only S.W., Petitioner, and Esteban were present during the first incident. Two of the other incidents occurred outside the apartment. The fact that they did not see Petitioner enter the bathroom S.W. was using during the remaining incident, does not prove that he did not. Further, both Petitioner and Amanda Harris testified at trial that there were times that Petitioner was alone with S.W. and that he was spending a lot of time with her.

In conclusion, the Court finds that Petitioner has not met the high burden to establish actual innocence. For this reason, the Court concludes it cannot excuse the untimeliness of his petition.

### III.    CERTIFICATE OF APPEALABILITY

The Court's dismissal of Beard's petition is a final decision ending the case. *See Pavlovsky v. VanNatta,* 431 F.3d 1063, 1064 (7th Cir. 2005) ("The dismissal of a suit as untimely is a dismissal on the merits, and so should ordinarily be made with prejudice, barring relitigation."). Petitioner may appeal only if he obtains a certificate of appealability ("COA"). Rule 11(a) of the Rules Governing § 2254 Cases provides that the district court must issue or deny a certificate of appealability when it enters "a final order adverse to the applicant." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."). Here, the Court cannot find that reasonable jurists would debate that the Petition is untimely or debate that Petitioner cannot excuse

his untimely filing. Accordingly, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## IV.    CONCLUSION

For the reasons stated above, Respondent's [17] Motion to Dismiss is GRANTED. Plaintiff's Amended [12] Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 is DISMISSED with prejudice as untimely. Petitioner's [20] Motino for Judgment on the Pleadings is MOOT. The Court declines to issue a Certificate of Appealability. This case is now TERMINATED, and the Clerk of Court is instructed to close the case.

ENTERED this 25th day of September 2025.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge